Case Numbers 24-54-52 and 24-54-53 Hanover American Insurance Company v. Tattooed Millionaire Entertainment et al. Argument not to exceed 15 minutes per side. Mr. Grable, you may proceed for the appellant. Good morning, Your Honors. May it please the Court, Jeremy Grable for Hanover American Insurance Company, and I believe I've reserved three minutes for rebuttal. All right. Your Honors, it's been almost ten years since the old House of Blues building in Memphis was intentionally set on fire, and my client was fraudulently induced to advance millions of dollars in insurance proceeds by Chris Brown and his company, Tattooed Millionaire. We've spent the better part of the last decade trying to recoup those funds, and it's obviously generated a lot of litigation. This is our third trip before this Court, and on both prior occasions, this Court has had to step in and correct errors that the District Court made below. And we are again asking this Court to do the same thing today, to step in and correct some fundamental legal errors that the District Court made in resolving the last issue, is allocation of $2.5 million in business personal property insurance proceeds. So as I'm sure Your Honors know, we had an initial trial back in 2018 when Hanover first discovered the fraud. We sued Mr. Brown, Mr. Falls, and Mr. Mott to try to recover the insurance payments. Jury trial happened, and the jury rendered a split verdict where they found that Mr. Brown and Mr. Mott had committed essentially insurance fraud, but they did not find that Mr. Falls had made any material misrepresentations himself. So the jury awarded the $2.5 million under the John Falls policy, and the District Court on a Rule 50 motion that we filed took that verdict away and found that Mr. Brown's fraud actually voided coverage under Mr. Falls' policy. So that was the first appeal that came up to this Court, and this Court held that the Rule 50 argument had been waived and was not properly preserved below, and so this Court reinstated the jury's verdict under the John Falls policy. Isn't there some argument that it was the nature of the inquiry to the jury that resulted in this, in the decision that we're arguing over now? And I assume that there was no objection to that on your part, is that correct? Judge, and that's exactly where I was going to go next. I think it's important to understand kind of the arguments that were made below, the issues that were put to the jury below, and then what is left, what was left and preserved by this Court five years ago for the subsequent interpleader action, which is where we are today. So the primary argument that we had made in the first case was that the proceeds under the Falls policy are not payable at all. The Falls policy is void because of a provision that talks about fraud by any other insured. So that was our primary argument. That was what the Court found had been waived. We advanced an alternative argument that said in the event that these proceeds are owed, well, they would go to Brown because Brown owns all of the gear that was insured by this insurance. So even though John Falls, the lessee of Studio B, bought this insurance policy, the policy had two types of coverage. Wasn't it because he had to make good on a loss? Didn't he have an insurable interest? He did. So he was leasing the studio and the lease for the gear in the studio required him to go buy insurance. So that's not terribly uncommon. And he had an insurable interest. He could buy insurance because he was leasing the gear. But that policy identified Chris Brown as the owner of the gear and as the loss payee. So even though Mr. Falls bought the insurance, it was for the benefit of Mr. Brown who owned the gear. I guess my point where I was going is our alternative argument that we made in the first case and that this Court five years ago talked about was assume that the verdict is reinstated for Falls and that money is triggered, that coverage is triggered. Well, then who does it go to? Does the money go to John Falls or does it go to Chris Brown? That's an allocation question. And this is the critical issue. It would be an allocation question if you ask the question in Hanover I as a separate line of decision making such that each person's rights were tied to a decision made about that person's fraud and the Falls decision was that he was not engaged in fraudulent behavior. That's right. That's right. And so the question of whether the $2.5 million in proceeds were triggered, whether that money, that coverage was triggered, that's been decided. The question is who does it go to? And we did raise that issue in Hanover I. And this Court in its opinion in 2020 said, it's very interesting. Both parties have interesting arguments. This is at the very end of its opinion on page 30. The Court recognized that this insurance coverage covers the loss of gear in John Falls' studio. However, Brown is the owner of that  Well, where are we left if, based on public policy and current state of the law, the determination is that Brown can't get anything because of his fraud here and falsifying invoices and doing other bad things and having pled guilty to criminal charges. If he's taken out of the equation, where would that leave us? That's our argument, Judge, is that the first issue is you have to decide where would this insurance money flow in the first instance without considering any of that. We argue that it should flow to Mr. Brown as the owner of the gear. That's a very practical result. I don't understand how a lessee is entitled to, in this instance, almost $2 million of these insurance proceeds when the owner would get a quarter of that? How is the owner to replace the property? It just doesn't make sense from a general practicality standpoint. But once you clear that first question, the money would flow to Mr. Brown, the loss payee and the owner of the gear. Then you have to hit the public policy argument under Box v. Lanier, and the District Court got this right. We don't have to pay Mr. Brown. Mr. Brown admitted to committing insurance fraud. He was essentially found guilty of that. He's pled guilty to the wire fraud in a criminal court. The outcome is that we don't have to pay the money. The District Court recognized that in its allocation. It allocated $2 million to Mr. Falls and $400,000-something to Mr. Brown, but it explicitly said, because of the public policy issue, Hanover does not have to pay Mr. Brown that amount. So while Mr. Falls, admittedly, was found not to have committed any insurance fraud himself personally, it doesn't mean he's entitled to a windfall. He's a lessee of this property, and the error that occurred is that... I guess what I'm kind of struggling with is, insurance premiums were paid, property was paid for the lost property, and they can't give it to Brown because Brown acted fraudulently. The jury found Falls did not act fraudulently, so if there is a bundle of money, who should get the benefit of it? You, Hanover, you were paid to insure it. Does it mean that because of the way the jury instructions were given, and the responsibility that Falls had to replace that equipment, to repair or replace the equipment in event of a loss or damage, then that would entitle him to coverage? That's the argument on one side. The argument on the other side is we shouldn't have to pay anybody. I mean, who bears, who loses out when you've been paid to cover something, and he's been found by a jury not to be fraudulent? Right. I understand that issue. Our position is that you have to first determine who the money would go to. Does it go to a lessee, or does it go to the owner? Setting aside kind of that weighing of equities and who would get the money, you first have to decide where does the money flow? Our corporate representatives... The court can make a determination that there was a coverage of the property, and the insurance proceeds do an owing, and even if Mr. Brown can't be the beneficiary of the proceeds, maybe it's paid to a receiver, and the court can subsequently decide what to do, but that doesn't alleviate the insurance company from having to pay out the policy proceeds that it's agreed to pay when something like this occurs. Judge, I would respectfully disagree. I think that's the rule of Box versus Lanier. Even if there's coverage and we have to pay, if there's a finding that the recipient of those funds committed wrongdoing, they don't get the money. It's true. We would keep the money in this instance, but that allocation question, that is essentially what this court preserved in the first opinion. That's what we've gone back in this interpleader action to do, and the fundamental error that the district court made was reading this court's first opinion to say, Hanover has no interest or no right in participating in the allocation, and Judge McCullough basically ignored all of our arguments. He just blanket said, you can't decide that. That's precluded by Hanover One. My point is, it's preserved by Hanover One, and so we have standing, we have an interest, and the district court didn't even consider the bulk of our arguments. So that's a fundamental legal error. Well, why do you have an interest, other than to pay out the proceeds that you've agreed to pay when there's a loss that occurs such as occurred here? Because for the very reason Judge Strange asked me, because of the fraud in this case by Mr. Brown, we have a sizable interest. If the money goes to Mr. Brown, we get to keep it. Let me ask you this. Who was the legally titled owner of the property at the time of the incident, at the time of the loss? Mr. Brown. Mr. Brown owned all of the gear in the studio, and the lease with Mr. Falls required... What about the building and... That was also Mr. Brown and Tattooed Millionaire, his company, which the jury found are indistinguishable. He had separate insurance on the building. We advanced money on that policy as well. He did not repair the building. He went off and bought a house in Cordova with it. We're fighting about that. But this idea that Mr. Falls' leasehold interest can be valued 30 years into the future, or 20 years into the future, based on his lost income, he bought lost income insurance. We paid that. Now he's trying to come in and get a windfall on the property side by using this lost income idea. Can you make your argument slightly differently, in that you could argue that this should not be an interpleader action because Mr. Brown is not eligible to participate? Well, Your Honor, first, I see my time's expired. Yeah, go ahead and ask. No, I think an interpleader was the proper mechanism. It was suggested to this court. This court in 2020 essentially blessed that idea and said there would be an interpleader. We have an interest. Well, when there's a decision to have an interpleader, that ruling or adjudication is that you've got more than one interested parties, both of whom are entitled to, arguably, to argue that they are entitled to payment. So, I mean, you'd have to argue that the interpleader decision was incorrect, wouldn't you? To wind up where you want to wind up here. No, Your Honor, there were multiple parties who asserted an interest. So, Hanover asserts an interest in these funds, Mr. Falls, Mr. Brown. There were also Mr. Futhi himself and his law colleague, Mr. Morris, asserted a claim in intervention. And then I think Triple G, the agency. So, there were multiple claimants that made claims in the interpleader. It's not just Falls, Brown, Hanover. So, I do think the interpleader was appropriate. And I'll address, I guess, the rest on my rebuttal. All right. Thank you. May I please court? Your Honors, good morning. My name is Malcolm Futhi, and I'm the counsel for the appellee, John Falls. This appeal is Hanover, Chris Brown, and TME's challenge to the district court's allocation of $2.5 million of John Falls' jury verdict in Hanover 1 that was against Hanover for the equipment that he had in the historic House of Blues Music Studio in Memphis, Tennessee. Now, Hanover filed this lawsuit, this Hanover 2 lawsuit, as a Rule 22 interpleader. But they also asserted a second declaratory action against John Falls. And what they were seeking as part of that, this paragraph 20 of their complaint, was to, quote, have the ruling in Hanover 1 declared, quote, unquote, null and void. Now, that is a complete attempt by Hanover to try to reverse Hanover 1. Now, the issues that we have in this case are actually two different sets. Now, the first and primary dispute is a bilateral dispute between John Falls and Brown TME regarding the valuation of their respective interests in the equipment. Now, John Falls had a lease hold with unlimited renewal options. He got it at 115th the market rate, and he was making a net annualized profit of $252,000. He had a sweetheart deal. That was evidence. He had a sweetheart deal that would have gone until he planned to retire sometime in 2045. Now, the second dispute that we have is a separate bilateral dispute between Hanover and Brown TME on the public policy issue as to whether Brown, as the individual with remainder interest, has any right to either a portion of the BPP or a credit against the judgment that Hanover has. Those are two separate bilateral disputes that are going on in this case. Now, John Falls obtained a summary judgment against Hanover based on race judicata claim preclusion. Now, in that summary judgment motion, the response by Hanover was they had no arguments as to the four elements for race judicata. They've never given an argument to that until they filed their reply in this appeal. But the first time in this appeal, they're saying, well, the judgment isn't final. Your Honor, under the Overstreet decision, that's Overstreet versus Lexington Fayette Urban County Government, 305 F3rd 566, Pennsite 578, Sixth Circuit case from 2002, you can't raise an argument for the first time in a reply. So that shouldn't be considered. But still, even though we got summary judgment, Falls got summary judgment as to Hanover, everyone got to participate in the trial. The judge heard from everybody. Hanover got to present their evidence, their witnesses. They got to cross-examine. There was a full trial. After the trial, the district court ruled on the first dispute between Falls and Brown TME that Falls' leasehold interest with unlimited remainder interest that Brown had in the property, because Brown was actually the one who owned the property, his remainder interest was worth $434,000 approximately. Based on that allocation, the court then went to the second issue, the bilateral dispute between Hanover and Brown TME. And the district court ruled that Brown had committed fraud and under the public policy exception had lost and forfeited any claim to his $434,000. We see no error in what the district court has ruled, and we would ask that the court affirm. We see that there are three issues on this appeal. One is the summary judgment on race judicata claim preclusion. The second one is whether the judge committed any errors in the law regarding leasehold interests or insurance. And then the third category is there were findings of fact by the judge, and those findings of fact should be reviewed for clear error, particularly the valuation and the question of whether the lease persisted after the fire. The standard of review for the question is a large de novo, but for the findings of fact, we have clear error. Hanover doesn't agree with that. I'm not really sure why they think the findings of fact should be reviewed for clear error, but there were certainly findings of fact that if any consideration is given, it should be under the clear error standard. I wanted to talk to you about a couple of questions that you raised, Judge Stranch. With regard to the jury questions, the Hanover 1 opinion from this court did notice that the claims were kind of siloed off, generally siloed off. You had Brown TME, Mott, and Falls. But there was some crossover. There was a claim that Hanover had that there was an unlawful insurance act, and that particular instruction said if Falls has committed fraud or has had anyone commit fraud on his behalf, then his policy is voided. So Hanover was able to get the question of whether Brown committed fraud on Falls' behalf to the jury. The jury said no. Additionally, in the first Hanover case, in response to Falls' counterclaim, Hanover asserted as their 17th affirmative defense that Falls did not have an insurable interest. So all these issues regarding whether Falls had a right to payment, a claim under the policy, was raised in Hanover 1. It should have been the subject of a jury instruction if Hanover chose to pursue it, but they didn't. So all this stuff is decided. We have Hanover 1. We have our judgment. The judgment for John Falls as to Hanover is set. Hanover 1 is decided. Under the rules of res judicata, these issues can't be relitigated, as well as any issue that could have been raised. They're gone. They're done. The bilateral dispute between Hanover and Falls was taken care of in Hanover 1. Now, Hanover has argued that somehow this court's opinion in Hanover 1 saved their right to re-attack Falls' judgment. Hanover 1 doesn't say that at all. The Hanover 1 judgment, at the end, the public policy section, notes that there are two issues left. Two issues, not one, two. One is Hanover's public policy issue against Brown TME. The second issue is that Falls and Brown will go sue each other. That's what the district court said in Hanover 1, and this court quoted it. Falls and Brown will go sue each other regarding their respective interests in the property. They are two separate issues. Is it your argument that that references the judgment's decision, the opinion's reference to such legal arguments regarding allocation in the subsequent proceedings? Yes, Your Honor, definitely. What is your best argument for saying that is the only way that language can be used? It says Falls and Brown will go sue each other. It specifically acknowledges the bilateral dispute in that language. Also, at the end of the paragraph, it says, in whatever proceedings. It contemplated there could be multiple proceedings, proceeding between Hanover and Brown TME, and then a separate one between Falls and Brown. The interesting thing, I think, that really brings us home, Your Honor, is that the only issue that the court noted was still alive for Hanover was the public policy argument. It didn't say Hanover had any claim with regard to the allocation, just the public policy. So if they have the public policy argument against Brown TME, then they can assert that against Brown TME. But that's all that was mentioned and preserved by Hanover 1. Nothing about Hanover gets to sidestep the rules of res judicata or claim preclusion. And your opposing counsel's argument is that what happens is you have to look to where the money will wind up. Yes, Your Honor. And that that governs that even though it's passing through Falls, that doesn't matter because it supposedly will end up going to Brown. Well, that gets us to the second point of how do you legally interpret the contract? And all due respect to Hanover, you're just completely wrong in their interpretation of the contract. The public, the policy that John Falls had and that the parties have... The insurance contract. Yes, Your Honor. Okay. Has a loss payable clause. And that loss payable clause says Hanover will, quote, pay any claim for loss or damage jointly to you and the loss payee as interests may appear. Joint payment. It's got to be a joint payment to Falls and the loss payee, which is not Brown, but TME, who actually doesn't even own the property, which is another problem that they have. It says it's going to be, it has to be a joint payment as interests may appear. So, and this is what Gary Bartman, the adjuster for Hanover, said in the trial of Hanover 1. And it's not an insignificant quotation because this quotation by Gary Bartman was cited by this court in the Hanover 1 decision regarding public policy. Gary Bartman says the payment has to be made jointly to Falls and Brown. So it has to go to Brown, you know, Falls and Brown. I think the real concern in Hanover 1, and it's kind of danced around, is the court wanted to make sure that there wasn't a check to Brown, to Falls and Brown. And then while the public policy issue is still pending, Brown gets the money and runs off. And that's what I tried to assure the court. My understanding was that there would be a check to Brown and Falls, Brown and TME, paid to us, kept in escrow in an interest bearing account, while Falls and Brown TME, we worked out our issues, we'd figure out the allocation, Falls would take his share, Brown would, the part for Brown would go into an interpleader then, because there was a lot of people wanting a chunk of Brown's portion. Hanover wanted it back either as being voided or as a judgment creditor. Glencore Brown was the law firm for Brown, they wanted a claim of it. Some experts wanted a claim for it. Triple G, the public adjuster, there's a whole bunch of people clamoring for Brown's. So it made sense that there would be an interpleader. But the public, the policy that Falls had says that it has to be made jointly. Now, Hanover, Brown TME, have been arguing, well no, you have to give priority to Chris Brown because he was the owner. They cite this union planner's case. The union planner's case is a mortgage case. A mortgagee has priority, but Brown isn't a mortgagee. And it's only in the context, and then Falls, in his own policy, does have this mortgagee, this lender payable clause, but it's not relevant. The relevant clause says it has to be made jointly. Even if you do take the priority argument that Hanover, Brown TME have made, you still have to figure out, well, what is his priority claim? If I have a $100,000 house with a $50,000 mortgage on it, if it burns down, that doesn't mean the bank gets the whole $100,000. The bank would have a priority for the $50,000 and then I would get the balance. In this case, the question is, well, what's the allocation? Well, the allocation is Brown's remainder interest is worth $434,000 and then Falls, even if you apply the priority argument, gets the $2,066,000. One other issue I'd like to kind of touch on is that Hanover can't understand why it is that Falls' leasehold interest is so valuable. And that's been the problem in this whole case. Hanover doesn't understand this lease, the music industry, or how it works. Falls was a lead singer of Egypt Central. He had four singles in the top 20. He had industry connections. He was able to help Brown get a band signed up with Sony Records. Now, Brown needed Falls because of that for the record label. Now, because of that, Falls negotiated this sweetheart lease. Normally, a lease like this would be $22,500 a month, according to Pete Matthews, our expert. Falls got it for $1,500 per month. And he got that sweetheart deal because he was helping Brown in another matter, but it had unlimited renewal options. It was a one-fifteenth market rate and he was able to make— And it was accurate that it required no notice? Yes, Your Honor. Is that why you get way into the future? Yes, Your Honor. The option, it gave him the option to extend, but it didn't have any specific notice requirement. And in fact, the retail lease that accompanied it said the renewal occurred automatically. So all that together, plus the testimony from Falls and Brown that they expected it to go on, really drives it home. But Falls has lost his leasehold interest. And it's a passive income of $252,000 a year profit. That he had expected and has lost. And he says, well, what should happen is Brown gets it and he replaces the equipment. Well, he can't do that now. Brown has said he would take the money and he would repay Hanover. So Falls cannot get the benefit of his leasehold interest. Normally, you would just replace it and then Falls would be able to go back into business making $252,000 profit off this passively. That's unavailable. Now, I know Hanover has said that they're in a Kafka-esque situation. I think it's a little bit dramatic. Never known of a Kafka protagonist who was a multi-million dollar insurance company. But really, they won't stop suing Falls. We ask that the district court's judgment be affirmed in our respect. Let me ask you this. Did the insurance company have a prior notice of the actual value before this terrible incident? Did the insurance company have prior notice provided by Mr. Falls of how he was valuing his leasehold interest for this $250,000 a year and that kind of thing? And if they didn't have notice and didn't know about it, does that detract from your argument in any way? The valuation of the leasehold interest, Hanover did hire a third party to come in and inspect the property and confirmed the existence of the property and the value. They knew it was $2.5 million. At what point in time, though? Was that after the destruction of the property? It was before the policy was issued. And then we asked, and to your point of whether it would matter, I asked Gary Barkman in Hanover 1, how should payment be made? It goes jointly to Falls and Brown. And I said, do you all care where it goes after that? And he said, no. So they really have no dogging. They definitely don't want to go to Brown, and I understand that. But typically, they don't have anything. All right. Thank you for hearing me, Your Honor. Very briefly, Your Honors. The Kafka-esque reference is we tried to raise this issue in the first appeal, and this court told us, go file an interpleader, raise it there. That's what we've done, and now they're asking this court to tell us, you should have raised it in the first case. So we think we're entitled to raise the allocation issue somewhere. We tried to raise it there. They told us to raise it here. We're raising it here. We should be entitled to raise it. But you almost don't have to get there, Your Honors, because Mr. Brown and TME have made all of the same arguments we're making. And if Mr. Brown and Mr. Falls are allowed to duke it out about their respective interests, all these issues are still on the table. I know Mr. Christopher is ill and wasn't able to appear, but Mr. Brown has appealed this allocation, too. The idea that this leasehold interest, this option to renew, is automatic, the district court fundamentally turned the idea of an option on its head. The option required an affirmative discussion. I want to renew. We want to renew. That never happened. What language do you rely on in saying that it required an affirmative statement and a negotiation? So the equipment lease was Exhibit 2 at the trial. It's in the appendix that we filed, pages 7 and 8. It's an option, and it requires the option to renew will be on such terms as the parties may agree at the time of such renewal. So it doesn't say it automatically renews. Counsel referenced the separate lease for the space, for the studio itself. That has different language. That one does automatically renew. The lease for the gear does not automatically renew, and the district court wrote that the lease on the gear extends automatically. That is erroneous as a matter of law. It's the wrong interpretation of the lease, and whether Hanover can make that argument or Brown can make that argument, that argument's been made. I think this court needs to resolve that issue. The idea that Mr. Falls' leasehold interest can be valued by projecting his lost business income over 15, 20 years, that is completely speculative in this case. He stopped paying rent after the fire. They all understood that the lease was over. There was never any discussion. Isn't there a case law that says that you don't have to pay until the pay on the lease until the property underlying is usable and functional again? There is, Your Honor, but the parties never intended to repair this, and they did not repair it. The idea that he bought business income insurance, the idea that he gets property insurance based on his business income concept, it just doesn't make sense. I think the concern we have is this court blessing the idea that a lessee can take all of the property insurance proceeds over an owner in this situation. That does not make any practical sense. Does it make practical sense if the reason the owner can't get it is because the owner was engaged in fraud? That is a unique circumstance in this particular case, but I don't think this court should bless a general concept based on that unique situation. We recognize that Brown's insurance fraud is unique and would not occur in most instances, but that doesn't change the general principle that the owner should get these proceeds in the normal course. If there's some value to this leasehold interest, at best it goes to March of 2017, which is the original two-year term. His expert said that even under his lost profits theory, he would have only had $200,000, $300,000, $400,000 in lost profits through that 2017 date. You have to take out the $500,000 in BI insurance that he got. Falls has no loss. His leasehold interest is worth nothing. At best, we've suggested the court could give him some de minimis amount, maybe the $100,000 or $200,000 that the expert says was lost through that period without subtracting the BI payment. Again, Your Honors, there have been a number of errors in this case over the years. We'd ask this court to reverse the district court's judgment here and either remand for a new allocation where the district court considers all of our arguments and evidence, or we do think this court could perform its own allocation and declare either that Falls takes nothing or that he takes a de minimis amount. Thank you, Your Honors. Thank you. Case is submitted.